Complainant secured a judgment against the Quaker City Motor Coach Lines, Incorporated, in the sum of $37,500, by *Page 147 
reason of serious injury sustained by her while riding as a passenger for hire in one of that company's motor buses.
Complainant collected from the motor coach company's insurer $10,115 on account of her judgment and costs and issued execution against the company for the balance. The execution was returned wholly unsatisfied, whereupon complainant sought to have a receiver appointed by this court, with the result that a custodial receiver was, in fact, appointed, pending the return of the order to show cause.
After the rendition of the verdict against the motor coach company, that company obtained a rule to show cause why the verdict should not be set aside or reduced in amount. Thus matters stood when a settlement was effected.
Under the terms of the settlement, complainant discontinued her receivership proceedings and the motor coach company abandoned its application for a new trial or reduction of damages. Complainant received $10,000 additional in cash and executed a release and satisfaction of the judgment.
The agreement for settlement was executed May 4th, 1931, and was joined in not only by the motor coach company but by the defendants Theodore T. Harris and Emily C. Harris, his wife, and as a matter of fact, the moneys which were eventually paid by virtue of the agreement of settlement were secured by notes endorsed by the Harris defendants and further secured by a chattel mortgage on the buses operated by the motor coach company, under lease from Harris.
Complainant alleges that the settlement above mentioned was procured through representations made by the defendant Theodore T. Harris and his attorney, a Mr. Stern, that the motor coach company was insolvent and had no assets. It is admitted that it was and still is insolvent and that at the time of the settlement the basis thereof was the ability of the motor coach company to pay, plus the willingness of Harris, the president of the company, to secure the payment of the additional $10,000 in cash, but complainant avers that there was one asset of the company not disclosed at the time of settlement.
Thus matters stood until January of 1932, when the United *Page 148 
States district court, at the suit of creditors, declared the motor coach company insolvent and appointed two receivers, who are made defendants in this action. These receivers discovered amongst the papers of the motor coach company an insurance policy in favor of the company, insuring it against the payment of judgments arising through personal injury or death resulting therefrom, arising out of the operation of its motor coaches. The receivers brought suit against the insurance company on this policy to establish liability against the company by reason of complainant's judgment. This litigation was compromised by the payment to the receivers of $1,200, in consideration of which payment the receivers executed a release to the insurance company. This was done without the consent of complainant.
On September 22d 1933, the following order was entered by the United States district court:
"That petitioner, Genevieve Hernig, be granted leave to institute suit in the court of chancery of the State of New Jersey, or in any other proper court against Robert K. Bell and Oswald M. Grotty, Esq., receivers for Quaker City Motor Coach Lines, Incorporated, defendant herein, and to set aside the agreement and settlement of May 4th, 1931, by and between said petitioner, Genevieve Hernig and the defendant herein, Quaker City Motor Coach Lines, Incorporated, and
"That the sum of twelve hundred dollars ($1,200) received by the said Robert K. Bell and Oswald M. Grotty, Esq., receivers for the Quaker City Motor Coach Lines, Incorporated, defendant herein, and in authorized settlement with Excess Insurance Company of America, and arising out of the contract of insurance by and between the defendant herein, Quaker City Motor Coach Lines, Incorporated, and the said Excess Insurance Company of America, by reason of injuries received and damages recovered by the said Genevieve Hernig and the payments on account of the said damages made by the said defendant herein, Quaker City Motor Coach Lines, Incorporated, be withheld by the said receivers, Robert K. Bell and Oswald M. Grotty, Esq., to await the outcome of the suit to set aside the agreement and settlement *Page 149 
of May 4th, 1931, aforesaid, and for the further disposition of the said sum thereafter by this court."
It will be observed that the disposition of the $1,200 settlement moneys is reserved to the United States district court and that the question before this court is — shall the agreement and settlement of May 4th, 1931, between complainant and the motor coach company and Harris be set aside? If it is to be set aside it must be because of fraud, as equity views fraud.
The facts, as I find them on this phase of the case, are as above set forth, plus the following:
Prior to the actual settlement consummated on May 4th, 1931, complainant's attorney was pursuing every available means of forcing the motor coach company to satisfy the complainant's judgment. They had secured what to them seemed to be all of the available insurance moneys, to wit, $10,115, from an insurance company other than the Excess Insurance company. They had started receivership proceedings which would have resulted in the winding up of the motor coach company's business. Mr. Harris, desiring the good-will of the motor coach company, consisting of buses, franchises, name, c., he and his attorney induced the settlement by truthful representation that the company itself was insolvent, and by his willingness to secure, by his own endorsement, coupled with that of his wife, and a chattel mortgage, a further sum of $10,000. They also represented that there were no other assets of the motor coach company and that there was no other insurance
than that upon which complainant had realized.
I find that this representation as to there being no other insurance was, in fact, made by both Mr. Harris and Mr. Stern, notwithstanding the fact that both Harris and his attorney deny it. They both testified that they were fully aware of the policy issued by the Excess Insurance Company, had it in their control and had discussed the question as to whether the motor coach company was covered by it; that they concluded that the policy did not cover, and I am satisfied that they were asked by the attorney for the complainant *Page 150 
as to the existence of any additional insurance and that their reply was that there was none. I believe, however, that having concluded that the insurance did not cover, they had dismissed the existence of the policy from their minds and did not intentionally deceive the attorney for the complainant. The result, however, is that that which turned out to be an asset of the motor coach company is now held by it, through its receivers, and complainant is deprived thereof.
It is apparent that this court is not called upon to determine the question as to whether Harris and his attorney were legally correct in arriving at the conclusion that the policy did not cover the motor coach company as to the judgment of the complainant. The result of their failure to fully advise the complainant as to the existence of the policy has inured to the benefit of the creditors of the motor coach company and to the disadvantage of the complainant. There can be no doubt that the complainant should have been advised as to the existence of the policy and have been given an opportunity to bring suit against the Excess Insurance Company, and if the complainant had been advised of the existence of the policy and had brought suit, there is no reason why the Excess Insurance Company would not have, at least, settled for an amount equal to that paid to the receivers appointed by the United States district court.
The finding by this court that the failure of the representatives of the motor coach company to disclose the existence of the insurance policy was not an intentional failure so to do does not prevent relief to the complainant in this court. In equity, the false representations need not have been knowingly made.
Vice-Chancellor Emery, in Du Bois v. Nugent, 69 N.J. Eq. 145,150, 151, held:
"* * * The reasons given for extending the equitable remedy of rescission to cases of innocent misrepresentations, which have induced a sale, has been best stated by Sir George Jessell, inRedgrave v. Hurd (1881), 20 Ch. Div. 1; 51 L.J. Ch. 117:
* * * It was put in two ways, either of which was sufficient to induce a court of equity to rescind. *Page 151 
It was said, `a man is not to be allowed to get a benefit from a statement which he now admits to be false.' That is one way of putting it. The other way of putting it was this: `Even assuming that you want moral fraud in order to set aside a contract, you have it where a man, having obtained a beneficial contract by a statement he now knows to be false, insists upon keeping that contract.' That, of course, is a moral delinquency; no man ought to seek to take advantage of his own falsity. It does not matter which way it was put, but that was the rule in equity. * * * This equitable rule had been previously declared in Rawlins v.Wickham (1858), 3 De G. J. 304, and In re Reese RiverSilver Mining Co. (1866), L.R. 2 Ch. App. 604, and was approved in Redgrave v. Hurd (1882), 20 Ch. Div. 1, and where, in the opinion of the court, the representation was made without reasonable grounds for believing it true, the right to rescind was considered to be based on even stronger grounds.Reese Silver Mining Co., supra; Kountze v. Kennedy (1895),147 N.Y. 124, 133."
 Pomeroy says, p. 1803 § 873:
"Every fraud, in its most general and fundamental conception, consists in obtaining an undue advantage by means of some act or omission which is unconscientious or a violation of good faith in the broad meaning given to the term by equity. Furthermore, it is a necessary part of this conception that the act or omission itself, by which the undue advantage is obtained, should be willful; in other words, should be knowingly and intentionally done by the party; but it is not essential in the equitable notion, although it is in the legal, that there should be a knowledge of and an intention to obtain the undue advantage which results. The willfulness of the act or omission is the element which distinguishes fraud from other matters by which undue advantage may be obtained so as to furnish an occasion for the equitable jurisdiction."
The concealment of the policy from complainant was a willful act, i.e., the defendants knew that they had it and did not disclose its existence, for reasons which to them seemed good,i.e., that the policy was void, but by their concealment they secured an unconscientious advantage over the complainant and the advantage they obtained was a violation *Page 152 
of good faith in the broad meaning given to the term by equity. No matter what they themselves may have thought with reference to the validity of the policy, they knew that they had such a policy and, in good faith, it was their duty to disclose that fact to the complainant, so that the complainant might have had an opportunity to insist upon an assignment of that policy, in addition to the moneys paid in settlement.
The failure of Messrs. Harris and Stern to disclose the existence of the policy amounts, in equity, to a constructive fraud, which is defined by Lawrence, in his work on EquityJurisprudence (vol. 2 p. 724), as follows:
"Constructive fraud has been evolved to designate what is, in its essence, nothing more than the receipt and retention of unmerited benefits."
Pom. § 901, says:
"If either party to a transaction conceals some fact which is material, which is within his own knowledge, and which it is his duty to disclose, he is guilty of actual fraud."
The concealment was the existence of the policy. Its existence was material. Was there a duty to disclose its existence?
In section 902, Pomeroy points out that there are three classes of cases where the duty exists and in which a concealment is, therefore, fraudulent.
"The second class embraces those instances in which there is no existing special fiduciary relation between the parties, and the transaction is not in its essential nature fiduciary, but it appears that either one or each of the parties, in entering into the contract or other transaction, expressly reposes a trust and confidence in the other; or else from the circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence in the particular case is necessarily implied. The nature of the transaction is not the test of this class."
In the negotiations between Harris and Stern and complainant's solicitor, looking toward a settlement, there was, of course, no fiduciary relation, but both parties were bound to act in good faith with reference to those things upon which *Page 153 
settlement was based, and one of the fundamental things upon which it was based was the ability of the defendant company to pay. Its assets were the subject of investigation by complainant and the insurance policy was not disclosed, although existing.
It appears that complainant was compelled to trust Harris and Stern as to their having made a full disclosure of all assets and that they had turned over all books and papers. It is true that complainant investigated the books and papers and had the benefit of the advice of expert accountants, but their reliance was that a full disclosure of the books and papers had been made and they trusted the statements of these gentlemen that such disclosure had been made when, as a matter of fact, the policy was concealed.
In Keen v. James' Ex'rs, 39 N.J. Eq. 527 (at p. 540), the court said:
"It is not every concealment, even of facts material to the interest of a party, which will entitle him to the interposition of a court of equity. The case must amount to a suppression of facts which one party, under the circumstances, is bound in conscience and duty to disclose to the other party, and in respect to which he cannot, innocently, be silent."
The circumstances upon which the settlement was made by the complainant was the ability of the defendant to pay and the defendant was bound, in conscience and duty, to disclose to the complainant its full ability to pay and its assets from which payment could be made, and the only person who had a right to speculate on the value of the insurance was complainant.
It is argued for the receiver that the complainant must return the moneys received by her on account of her judgment before this court will grant relief.
It is quite evident that to compel the complainant to restore the motor coach company and Mr. Harris to their positions as of the date of settlement would result in denying to complainant the relief she seeks. The cash received by her was, to a large extent, required by her to liquidate her obligations to hospitals, doctors, nurses and lawyers, and has *Page 154 
been expended by one who is not financially able to restore the fund.
It may be said that the evidence does not disclose this situation, and this is true, but my belief is that all parties admit this situation, which is known to the court, before whom, while on the circuit bench, the damage case was tried. However, unless the parties agree on this factual situation, further testimony may be taken by complainant.
As to the rule with reference to the duty on the part of complainant to return the moneys received by her, it would seem to me that the rule stated by Vice-Chancellor Emery in Du Bois
v. Nugent, supra, and other cases therein cited, are a sufficient answer to defendant's contention:
"* * * Generally, a rescission before action brought is necessary in an action at law (Conlan v. Roemer, 52 N.J. Law.
(23 Vr.) 53, 58), but in equity a bill for rescission may be sustained, although no rescission or offer to rescind has been previously made or attempted. The distinction between the two classes of remedies is, that the action brought at law is generally based on the theory that the rescission has already been legally completed by the action of the injured party, while the equitable remedy reaches also to a rescission by judicial action, based on the right to rescind for the reasons charged in the bill. Gould v. Cayuga County National Bank (1881),86 N.Y. 75, 83 * * *."
Mr. Justice Swayze, in Roberts v. James, 83 N.J. Law 492,494, held:
"Even where he has in fact received something under the contract, he is not always bound to return it. The rule, * * * like other rules of justice must be so applied in the practical administration of justice as shall best subserve, in each particular case, the undoing of wrong, and the vindication of the right. * * * Pidcock v. Swift, 6 Dick. Ch. 405, 408; Guild,Executor, v. Parker, Receiver, 14 Vr. 430; Doughten v. CamdenBuilding and Loan Association, 14 Stew. Eq. 556."
To the same effect is Pidcock v. Swift, 51 N.J. Eq. 405;affirmed, 53 N.J. Eq. 238: *Page 155 
"Where a judgment creditor is induced to assign his judgment for a small sum, upon the misrepresentation of a debtor's ability to pay, neither a return nor an offer to return the consideration was deemed essential to maintain the bill."
The defense of laches was also urged by the defendant, but there is nothing before me to indicate that the complainant was at all guilty of laches in the prosecution of her suit. She was unaware of the existence of the policy in question until after the receivers obtained possession of it and she instituted her suit in this court within a reasonable time after her discovery of the existence of the asset.
It is said that the amount due complainant on her judgment was not finally determined at the time of the settlement because the defendant had a rule to show cause against the plaintiff which was discharged by consent of all parties, as a part of the settlement. It is true that such a rule had been granted by the circuit court judge, but the basis of the discharge of the rule was defendant's allegation and representation that there were no other assets and no other insurance, and it was defendant's own wrong that brought about the discharge of the rule to show cause and defendant may not take advantage of that wrong.
The relief to be granted shall be that the agreement of May 4th, 1931, and the release given in pursuance thereof be set aside, to the end and to the extent that complainant may take such action looking toward a recovery under the insurance policy of the Excess Insurance Company of America as she may be advised, in order that this asset, if it be one, inure to the benefit of the complainant. It appears to be such an asset as to the sum of $1,200 already paid by way of settlement, but what steps the Excess Insurance Company may take, in view of the finding herein, is a matter for the determination of the United States courts, which court has jurisdiction over the defendant company by virtue of insolvency proceedings, and which court has permitted its receiver to be sued herein in order that the question of fraud,vel non, may be determined by this court. *Page 156